UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA

                              -v-                                  22-cr-487 (NRM)
                                                                               MEMORANDUM &
                                                                               ORDER

QUADRI GARNES,
                       Defendant.

------------------------------------------------------------------x

NINA R. MORRISON, District Judge:

      In December of 2024, Quadri Garnes stood trial under a superseding indictment charging him with two counts: 1) threatening federal officials, in violation of 18 U.S.C. § 115(a)(1)(B); and 2) transmitting in interstate commerce a communication containing a threat to injure, in violation of 18 U.S.C. § 875(c). The government's case at trial turned on its contention that Garnes, while inquiring about the status of his unemployment insurance benefits during a phone call with a representative from the New York Department of Labor ("DOL"), made threats to injure both DOL employees and United States Postal Service ("USPS") employees.

      At the close of the government's case, Garnes made a motion under Federal Rule of Criminal Procedure 29 ("Rule 29") for a judgment of acquittal as to both counts. The Court granted Garnes's motion as to the charge of threatening federal officials for the reasons stated on the record, but reserved ruling on Count Two. As to Count Two, Garnes argued that because the call in which the threats were made was placed by the DOL official, not Garnes himself, he did not "transmit" any of the

1

allegedly threatening communications made during that call, thus depriving the government of an essential jurisdictional prerequisite under 18 U.S.C. § 875(c).

After careful consideration of the parties' arguments, the evidence at trial, and the plain language of 18 U.S.C. § 875(c), the Court DENIES Garnes's motion for a judgment of acquittal as to Count 2 of the superseding indictment.

## BACKGROUND

### I.  Procedural History

This case began on October 6, 2022, when the government filed a complaint against Quadri Garnes, charging him with threatening federal officials, in violation of 18 U.S.C. § 115(a)(1)(B). Compl., ECF No. 1. On October 25, 2022, a grand jury indicted Garnes on the same charge. Indictment, ECF No. 18. Finally, on June 16, 2023, a grand jury returned a superseding indictment, which contained the charges that were at issue in the eventual trial. *See* Superseding Indictment, ECF No. 23. The Superseding Indictment again charged Garnes with threatening federal officials, but also contained a second count: transmitting in interstate commerce a communication containing threats to injure, in violation of 18 U.S.C. § 875(c). *Id.* at 2.[1] While Count One of the Superseding Indictment — concerning the threatening of federal officials — charged Garnes with threatening employees of the United States Post Office, Count Two alleged that Garnes "did knowingly and willfully transmit in interstate commerce one or more communications containing one or more threats to

---

[1] All page numbers in litigation documents refer to the ECF generated pages, not the document's internal pagination.

2

injure the person of another, to wit: communications threatening employees of the New York State Department of Labor." *Id.*

Trial was originally scheduled to take place in July of 2023. *See* 5/31/2023 Minute Entry and Order. After jury selection, but prior to the jury being sworn, the government took an interlocutory appeal from one of the Court's rulings on the pretrial motions *in limine*. *See* 7/11/2023 Minute Entry; Notice of Appeal, ECF No. 43. On May 28, 2024, the Second Circuit reversed this Court's decision on the motion *in limine* and remanded the case. *See generally United States v. Garnes*, 102 F.4th 628 (2d Cir. 2024).

Jury selection began again on December 9, 2024. *See* 12/9/2024 Minute Entry. Over the course of an approximately five-day trial, including jury selection and deliberations, the government introduced the testimony of six witnesses to support its case against Garnes. *See* 12/11/2024 Minute Entry; 12/12/2024 Minute Entry. On December 12, after the close of the government's case, Garnes moved this Court to grant a judgment of acquittal under Rule 29 with regard to both counts. *See generally* Garnes Rule 29 Mot., ECF No. 62. This Court reserved on Garnes's motion under Federal Rule of Criminal Procedure 29(b) with respect to Count Two — charging Garnes with transmitting a communication in interstate commerce containing threats to injure. *See* Tr. at 422. The next morning, December 13, 2024, prior to charging the jury, this Court issued an oral ruling granting Garnes's motion under Federal Rule of Criminal Procedure 29(a) with respect to Count One — threatening federal officials. *See* Tr. at 429–55 (finding, *inter alia,* that the government had not

3

presented any evidence from which a jury could reasonably conclude that Garnes intended for the alleged threats he made in his phone call with the NYSDOL to be conveyed to any employees or officials at the United States Postal Service, nor that he acted with the intent to impede, intimidate, or interfere with their duties).

Later that day, the jury reached a verdict on Count Two, finding Garnes guilty of transmitting in interstate commerce a communication containing threat to injure, in violation of 18 U.S.C. § 875(c). *Id.* at 598. As the Court had reserved on Garnes's motion under Rule 29 regarding that Count, the parties were given leave to submit supplemental briefing in support of and opposition to the motion. *Id.* at 602–03; *see* Garnes Supp. Mot., ECF No. 70; Gov. Opp., ECF No. 72; Garnes Reply, ECF No. 75. After the Court granted various consent motions to extend the briefing schedule by both parties, the motion was fully briefed and submitted to this Court on May 18, 2025. *See* Garnes Reply.

## II.    Evidence Presented at Trial

Viewed in the light most favorable to the government, *see United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008), the evidence at trial established the following facts.[2]

On September 29, 2022, Garnes, a resident of New York City, Tr. at 277–78, placed a call to the DOL, but the call was disconnected. Tr. at 78. DOL customer

---

[2] Because the only count at issue in the instant motion is Count Two, this Court's summary of the evidence at trial will not include facts offered by the government solely as to Count One.

4

service representative Onika Dover returned Garnes's phone call, *id.* at 78; Gov. Ex. 1A.[3]  Former Verizon Principal engineer Kurt Karlik testified that while the call was between two parties who were both located in the State of New York, the call "passed through the Salt Lake City [, Utah] switch."  *Id.* at 166–68; *see* Gov. Ex. 20 (Summarizing a call record showing a call originating at 7:26 Mountain Time from a phone number confirmed to be the DOL to Garnes's phone number with a switch location of "Salt Lake City, UT.").  Karlik testified that even when the two sides of a telephone conversation are in the same state, the call can be routed through a switch location out of state to "allocate your traffic," which can be "good in times of surge calling."  Tr. at 170.

The government presented testimony from Douglas Hammond, who, at the time of the call, was the Supervising Labor Services Representative at the DOL and stationed at the DOL office in Albany, New York.  *Id.* at 73, 86.  During the call, Hammond and other supervisors were informed by Dover that the person she was speaking with (Garnes) had made a threat of harm against people, and she requested that one of her supervisors take over the call.  *Id.* at 80–81.  The call was then transferred to Hammond, who spoke with Garnes for approximately 25 minutes.  *Id.* at 86.  Through the duration of the approximately 45-minute-long call with both Dover and Hammond, Garnes — who had most recently been employed by the United

---

[3] At trial, the government introduced the entire audio of the call which was initiated by DOL employee Dover.  *See* Gov. Ex. 1; Tr. at 75.  As the call was over 45 minutes long, the government also introduced many shorter clips excerpted from the call.  *See* Gov. Ex. 1A–W; Tr. at 77.

5

States Post Office — expressed frustration with the fact that he was being told he was not eligible for unemployment benefits that he believed he had earned during his prior periods of employment. *Id.* at 86, 116.

Over the course of the call, in speaking to Dover and Hammond, Garnes said, *inter alia*: "If I go back to the post office I'm gonna shoot somebody, I got eighteen and a half years in jail," Gov. Ex. 1C, *see* Tr. at 82–83; "Y'all gonna make me go to jail for killing somebody at unemployment," Gov. Ex. 1F, *see id.* at 83–84; "Does the city want me to kill five or six different people just because I can't pay my rent?" Gov. Ex. 1K, *see id.* at 142; "I know this is recorded, because if I was to do something like that, at least when they start going through the records, they know why it was done. . . . I got eighteen and a half years in jail — it don't bother me to be in jail," Gov. Ex. 1L, *see id.* at 90–91; "You might see this shit on TV, just remember my name, you might see it on TV tonight," Gov. Ex. 1M, *see id.* at 91; "No, believe me, I'll be at the New York State Department of Labor down on, on, on Schermerhorn or Livingston Street and I will make a big fucking deal out of it," Gov. Ex. 1N, *see id.* at 91–92; "Somebody might get shot today coming out of Department of Labor," Gov. Ex. 1R, *see id.* at 94.

Hammond testified that he believed Garnes "was going to make good" on his purported threat to kill five or six different people, Tr. at 90, and his statement indicating that Hammond might see this on TV indicated that "this was a real threat of harm against others," *Id.* at 91.

The government also presented testimony from other individuals, including from the New York State Police and the United States Postal Inspection Service,

6

regarding their response to the alleged threats made by Garnes, for the purpose of demonstrating the statements' impact on those who learned of them and how seriously they were taken. *See, e.g.,* Tr. at 185–88, 208–20.

### III.    Jury Instructions and Verdict

After both sides rested and delivered their summations, the Court charged the jury. Tr. at 559–87. With regard to Count Two, the Court informed the jury that the "statute relevant to that charge is Section 875(c) of Title 18 of the United States Code; which states: Whoever transmits in interstate commerce any communication containing any threat to injure the person of another, shall be guilty of a crime." Tr. at 577. The Court explained that the elements the government must prove are that Garnes "threatened to injure the person of another;" that he "transmitted the communication in interstate commerce;" and that he "transmitted the communication knowingly and intentionally." *Id.*

Regarding the second element, the Court instructed the jury that "the government must prove that the communication passed between two or more states" and that they "may find that a telephone communication passed between New York and another state if the government proves that the call was routed through a facility in a state other than New York." *Id.* at 580.

As for the third element, the Court instructed the jury that the government must prove that Garnes "made the communication at issue knowingly and intentionally" and that he "transmitted the communication either for the purpose of

7


issuing a threat, or that he did so with the knowledge that the communication would be viewed as a threat." *Id.* at 581.

After deliberations, the jury returned with a verdict of guilty on Count Two.[4]

## **DISCUSSION**

### I.   Legal Standard

Under Federal Rule of Criminal Procedure 29(a), "[a]fter the government closes its evidence or after the close of all evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to so sustain a conviction." Fed. R. Crim. P. 29(a). In making this challenge, the defendant indeed "bears a heavy burden," *United States v. Hamilton*, 334 F.3d 170, 179 (2d Cir. 2003), as the court "must credit every inference that could have been drawn in the government's favor, and affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt," *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006) (internal citations omitted). If "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the Court cannot grant the motion. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

### II.   Analysis

Garnes does not argue that the evidence presented at trial was so insufficient that a reasonable jury could not have found the statements he uttered were true

---

[4] As Count One was dismissed by the Court prior to charging the jury, *see supra*, that Count was not submitted to the jury.

threats to employees of the DOL. Nor does he argue that because the phone call, which was routed through a Verizon "switch" in Utah, took place between parties who were all in New York State, it was not "in interstate commerce."

Rather, Garnes's argument is that 18 U.S.C. § 875(c) cannot reasonably be interpreted to cover the method of "transmi[ssion]" at issue here: statements made during a phone call that Garnes himself did not dial or otherwise place. Garnes Rule 29 Mot. at 2. Garnes's motion focuses on the portions of Section 875(c) that require the government to prove there was a "communication containing [a] threat" and that the communication was "*transmit[ed]*" in interstate commerce. 18 U.S.C. § 875(c) (emphasis supplied). His argument is simple: because the phone call at issue was actually placed by a DOL employee, and Garnes was the one who answered the call, he did not *transmit* the communication that contained the threats. *See* Garnes Rule 29 Mot. at 4.

On its face, Garnes's argument has an intuitive — even logical — appeal. 18 U.S.C. § 875(c) reads, in full:

> Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 875(c). As Garnes points out, the plain meaning of the word transmit is "to send or convey from one person or place to another." *Transmit*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/transmit (last visited July 14, 2025); *see also Transmit*, Black's Law Dictionary (12th ed. 2024) (defining transmit as "to send or transfer (a thing) from one person to another"). The fact that the statute

9

does not criminalize "transmitting threats in interstate commerce," but rather prohibits "transmit[ting] in interstate . . . commerce any *communication* containing a threat" certainly provides grounds for Garnes to make a reasonable argument — as he does here — that the "communication" containing the threat must be something other than a defendant's spoken words, *i.e.,* the phone call itself.  *See* Garnes Rule 29 Mot. at 4–7.

The Court also agrees with Garnes that his Rule 29 motion cannot simply be dismissed as one based on a mere "technicality" that would, in the government's view, lead to absurd results.  *See* Tr. at 364 (government stating, at oral argument on Rule 29 motion, that "[t]here's no reason to think that . . . [C]ongress was trying to draw [18 U.S.C. § 875(c)] narrowly on the basis of an apparent technicality").  That is particularly so in light of the fact that Garnes was only tried for this federal offense because of what might reasonably be characterized as a hyper-technical reading of the "interstate commerce" language in the statute — albeit a well-established one. For there is no dispute that the government would not have been able to charge Garnes with a violation of § 875(c) had the call between Garnes and the DOL been routed through an ingress switch in, say, Poughkeepsie, New York — rather than (as it was) through a Verizon center in Utah, a coincidental fact that was not known to any of the parties on the call at the time.  Yet as Garnes concedes, it is well established that "even a communication that originates and ends in the same state will support federal jurisdiction if the communicated threat makes its way to the recipient by means of interstate electronic transmission." *United States v. Veliz,*

10

3-cr-1473 (GEL), 2004 WL 964005, at *2 (S.D.N.Y. May 5, 2004); *see also United States v. Kammersell*, 196 F.3d 1137, 1139 (10th Cir. 1999) ("A threat that was unquestionably transmitted over interstate telephone lines falls within the literal scope of the statute and gives rise to federal jurisdiction.").

By the same token, then, if the (undisputed) fact that Garnes was the recipient, rather than initiator, of the phone call at issue means that he did not "transmit" the threatening communications within the meaning of § 875(c), granting his Rule 29 motion would be no more based on a "technicality" than the coincidental routing of the call through Utah that gave the federal government a vehicle to prosecute him on this charge in the first place. Indeed, when interpreting a federal criminal statute, the "*jurisdictional* elements simply 'connect the law to one of Congress's enumerated powers, thus establishing legislative authority.'" *United States v. Escalera*, 957 F.3d 122, 130 (2d Cir. 2020) (alteration adopted) (emphasis in original) (quoting *Torres v. Lynch*, 578 U.S. 452, 467 (2016)).

Finally, before turning to the crux of Garnes's argument (which it ultimately finds to be without merit), the Court pauses to address the government's contention that granting his motion would lead to "absurd" results. *See* Tr. 360–61; *see also* Gov. Opp. at 17 (arguing that, under Garnes's interpretation, a defendant would be "insulate[d] from liability" if they "stopped short of personally hitting 'send' or initiating the actual transmission, allowing them to exploit algorithms, reposts, and viral sharing as mechanisms to threaten others, yet claim legal immunity because the final step in the transmission chain was performed by an 'intermediary.'"). This

11

argument is misplaced, for at least two reasons. First, the jurisdictional element of a criminal statute "normally ha[s] nothing to do with the wrongfulness of the defendant's conduct." *Rehaif v. United States*, 588 U.S. 225, 230 (2019). Second, adopting Garnes's interpretation would not allow him or others to escape liability for statements that a jury finds to be threatening. It would simply strip *federal* courts of jurisdiction over that issue. New York State also penalizes the same kinds of threatening conduct at issue in Garnes's case. *See* N.Y. Penal Law § 240.78 (criminalizing "[m]aking a threat of mass harm" when, "with the intent to intimidate a group of people or to create public alarm, such person threatens to inflict or cause to be inflicted, serious physical injury or death at a . . . government building, . . . and thereby causes a reasonable expectation of fear of serious physical injury or death"). As the Supreme Court has noted, overlapping state and federal jurisdiction for the same criminal conduct can raise concerns about the federal government's encroachment on the states' traditional role in enforcing criminal laws, as "[w]hen Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction." *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995) (internal quotation marks omitted); *see also Jones v. United States*, 529 U.S. 848, 858 (2000) (interpreting a criminal statute to avoid "render[ing] the traditionally local criminal conduct in

which in which petitioner . . . engaged a matter for federal enforcement" (internal quotation marks omitted)).[5]

Ultimately, then, this Court's only task is to determine whether the statute's jurisdictional elements incorporate Garnes's conduct. And the Court finds that the plain language of § 875(c) does so — *i.e.,* that by voicing what the jury found to be threatening communications in his phone call with the DOL, Garnes "transmitted" those threats in interstate commerce.

Garnes's claim that a person who received, rather than placed, a phone call in which he proceeded to make threatening statements cannot be prosecuted for the crime of transmitting threats in interstate commerce under 18 U.S.C. § 875(c) appears to be a matter of first impression in this Circuit, and perhaps nationally.[6]

---

[5] It is not only principles of federalism that have led to criticism of the overlap of federal and state criminal laws. As commentators have noted, substantially disparate outcomes can befall a person accused of a crime depending on whether his or her conduct is prosecuted in state court or federal court. *See* Rachel E. Barkow, *Our Federal System of Sentencing*, 58 Stan. L. Rev. 119, 126 (October 2005) (noting that because of its limited jurisdiction, "the federal government sets sentences for federal crimes without comparing those crimes to the full array of criminal conduct"); *See also* Steven D. Clymer, *Unequal Justice: The Federalization of Criminal Law*, 70 S. Cal. L. Rev. 643, 669–74 (March 1997) (outlining five ways in which defendants may "receive less favorable treatment in federal court than state court").

[6] Neither Garnes nor the government has identified any cases, from any circuit, analyzing this issue. The closest is the government's citation to *United States v. Liesse*, in which the Ninth Circuit summarily found, in a footnote, that "[t]o the extent [the defendant] contends that § 875(c) requires the government to prove that he placed the phone calls which transmitted his communications, this argument fails because the plain language of the statute does not support his contention." 2021 WL 5275819, at *1 n.1 (9th Cir. Nov. 12, 2021). But this case has limited persuasive weight in light of the brevity of the Court's reasoning (and the fact that it is unclear

13

The Court thus begins its analysis with the statutory text. *See United States v. Ron Pair Enterprises*, 489 U.S. 235, 240–41 (1989) ("[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute.").

The statute bans the transmission of "any communication containing any threat." 18 U.S.C. § 875(c). Garnes, invoking the rule against surplusage, argues that "[t]he use of the word 'containing' demonstrates that 'communication' and 'threat' are not equivalent terms" and "the communication is the *vehicle—e.g.*, a phone call, email, or text message—that communicates the threat." Garnes Rule 29 Mot. at 7 (emphasis supplied).

The problem with Garnes's argument is that it elevates the rule against surplusage over the meaning of the actual words in the statute. While Garnes focuses on the definition of "transmit," his proposed definition of "communication" is not supported by the commonly understood meaning of that word, nor by the caselaw. Black's Law Dictionary defines communication as "[t]he interchange of messages or ideas by speech, writing, gestures, or conduct; the process of bringing an idea to another's perception." *Communication*, Black's Law Dictionary (12th ed. 2024).

---

whether the defendant made that argument in any event). The other case cited by the government is a non-precedential summary order in *United States v. Peets*, in which the Second Circuit affirmed a conviction under 18 U.S.C. § 875(c); from the factual recitation in the order, it appears the defendant did in fact receive the phone call(s) at issue. 165 F.3d 15 at *1 (2d Cir. 1998) (summary order). However, it does not appear that the defendant in *Peets* raised, nor that the Circuit considered, any claim that receiving phone calls was excluded from the statute's definition of "transmitting" a "communication." *See id.*

14

When analyzing a similar statute prohibiting threatening communications, the Kansas Supreme Court noted that a communication involves "both the declaration of a threat and the perception and comprehension of the threat," explaining that "there are two acts compromising the constituent and material elements of the offense — speaking and perceiving." *State v. Woolverton*, 284 Kan. 59, 70 (2007). The plain meaning of the word "communication" indicates that it refers not to the *vehicle* or *instrumentality* by which information travels, but rather the information itself that is being exchanged.

Garnes also cites an Eleventh Circuit decision, *United States v. Scott*, 441 F.3d 1322 (11th Cir. 2006), for the proposition that "communication" refers to the vehicle that carries the information conveyed, rather than the information itself, and thus (in Garnes's view) equating "communication" with "telephone call." Garnes Supp. Mot. at 6. In *Scott*, the Eleventh Circuit considered whether a district court correctly applied a sentencing enhancement pursuant to U.S.S.G. § 2A6.1(b)(2), which applies when an offense "involve[s] more than two threats." *Scott*, 441 F.3d at 1323. It is true that in *dicta*, the Eleventh Circuit explained that it took a different view than the Seventh Circuit and other circuits which "have associated the number of threats for § 2A6.1(b)(2) purposes with *the number of communications made* (telephone calls or letters)." *Id.* at 1327 (emphasis supplied). But in *Scott*, the Court did not actually analyze the statutory text at issue in Garnes's case (or any statute, for that matter, as it concerned an interpretation of the Sentencing Guidelines). *Id.* More fundamentally, the *Scott* Court actually held that the enhancement at issue was

15

properly applied because "multiple threats in [a single] mailing were distinct in their nature and purpose." *Id.* To the extent that *Scott* has any bearing on this case, then, it supports the government's position. For if more than one threatening communication can be encompassed in a single mailing, it is the statements *within* the mailing (or phone call) that comprise the relevant "communications." *Id.*[7]

Garnes's argument that because he did not *place* the phone call, he did not *transmit* any communications, also misunderstands how telephone communication works. It improperly limits the inquiry of when a "communication" is "transmitted" to only the moment the phone call is dialed. Garnes's interpretation might have more force in the context of internet messages or social media posts, where the information is conveyed simultaneously with the conveyer pressing "send" or "post." But in the context of a telephone, *no* information is conveyed the moment that a person places a call. A telephone simply rings (or, on modern cell phones, otherwise signals an incoming call on the recipient's screen) and then it is either answered or not. Thus, prior to either the caller or the recipient speaking after the call is connected, no "communication" has been "transmitted," as a "communication" requires "the

---

[7] Nor does the Court agree with Garnes that *United States v. Korab*, 893 F.2d 212 (9th Cir. 1989), and *United States v. Paredes*, 950 F. Supp. 584 (S.D.N.Y. 1996), support his interpretation of § 875(c). In *Korab*, the Ninth Circuit reversed a conviction under the statute because the communications in interstate commerce (in that case phone calls) simply did not contain threats, 893 F.2d at 214–15; nowhere did it define the phone calls themselves (rather than the words spoken during the calls) as the relevant "communications." *Paredes* concerned communication via a paging system, 950 F. Supp. at 590, which unlike a telephone, does necessarily convey the information meant to be communicated at the same time the individual "dials" (*i.e.,* inputs the words into the device) or hits "send."

16

interchange of messages or ideas." *Communication*, Black's Law Dictionary (12th ed. 2024).  A telephone (unlike a telegraph, which "was still the primary mode of interstate communication" when the "last significant amendment" to § 875(c) was made in 1939, *Kammersell*, 196 F.3d at 1138–39) provides simultaneous communication between both sides of the call.  This means that once a phone call is connected, information can be "transmitted" from each speaker to the other speaker on the call — it is no longer flowing in one direction.  This interpretation is supported by the very names of the components of the telephone itself — a telephone has a receiver and a transmitter, and no matter who placed the call, when one person speaks, the "transmitter" turns the vibrations of their voice into electronic signals, and the "voltages are amplified for *transmission* over the telephone line."  *See Telephone*, Encyclopedia Britannica Online, https://www.britannica.com/technology/telephone/Dialer (last visited July 14, 2025) (emphasis supplied).  This is how the word "transmit" has been understood in the context of a telephone as far back as 1888, when the Supreme Court considered the validity of patents filed by Alexander Graham Bell.  *See Dolbear v. American Bell Tel. Co.*, 126 U.S. 1, 532–33 (1888) ("Bell discovered that [speech could be reproduced] by gradually changing the intensity of a continuous electric current . . . .  He then devised a way in which these changes of intensity could be made, and *speech actually transmitted*." (emphasis supplied)).  Thus, this Court finds that the "transmission" of the communication in the context of a telephone call does not occur when the phone call is placed, but rather when a person speaks into the transmitter, and the

17

electronic signals representing his or her words are sent to a listener on the other end of the telephone conversation.

This is not to say that the moment a person speaks is the *only* time his or her words can be "transmitted" for the purposes of § 875(c). The Second Circuit's opinion in *United States v. Kelner* is illustrative. 534 F.2d 1020 (2d Cir. 1976). In *Kelner*, the defendant was prosecuted under § 875(c) *and* 18 U.S.C. § 2. *Id.* at 1020. Section 2 provides that "[w]hoever willfully causes an act to be one which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b). The defendant in *Kelner* held a press conference at which he was interviewed by a reporter from local news station WPIX, and he said that he was "planning to assassinate [Yasser] Arafat." *Id.* at 1021. Following the conference, WPIX broadcast the tape of the interview on the ten o'clock news. *Id.* Even though it was WPIX, not the defendant, who "transmitted" the communication in interstate commerce, the Second Circuit noted that § 2(b) allowed him to be prosecuted as a principal because "Kelner willfully caused the transmission of his threat over the WPIX facilities." *Id.* at 1022.

Thus, in *Kelner*, the communication containing a threat was actually transmitted twice. The defendant first transmitted a communication containing a threat when he gave the interview expressing his intent to assassinate Arafat. *Id.* at 1021. At this moment, however, the communication was not transmitted *in interstate commerce*, and Kelner could thus not be prosecuted under 18 U.S.C. § 875(c). *Id.* at 1022. However, when WPIX broadcast the communication with "a telecast range of

18

50 miles extending into Connecticut and New Jersey," the communication had been transmitted in interstate commerce. *Id.* at 1021–22. Because the defendant "willfully caused the transmission of his threat over the WPIX facilities, . . . intending (or at least reasonably foreseeing) that his statement would be transmitted in interstate commerce by others," he was appropriately "held responsible as a principal under 18 U.S.C. § 2(b)." *Id.* at 1022.

In the instant case, there was no need for the government to charge Garnes under § 2(b), since at the moment he transmitted his communication containing threats over the telephone, it also moved in interstate commerce, as it was routed through Salt Lake City, Utah. Tr. at 169. It is of no matter that Garnes was not aware that the call was being routed out of state, as "[t]he element of interstate commerce is a device through which to obtain federal jurisdiction, and does not require a mens rea element." *United States v. Francis*, 975 F. Supp. 288, 291 (S.D.N.Y. 1997), *rev'd on other grounds*, 164 F.3d 120 (2d Cir. 1999).

In sum, Garnes cannot succeed on his Rule 29 motion because the government's interpretation of § 875(c) — encompassing a threat that is made during a phone call that was routed in interstate commerce, regardless of whether the defendant initially placed or received that call — is a reasonable application of the statute's plain text. Viewing the evidence in the light most favorable to the government, because Garnes spoke words that communicated threats into the transmitter of his telephone, and that communication was transmitted over state

19

lines, a reasonable jury could have found him guilty of transmitting, in interstate commerce, a communication containing a threat to injure a person.[8]

## CONCLUSION

For the foregoing reasons, Garnes's motion under Federal Rule of Criminal Procedure 29 for Judgment of Acquittal as to Count Two of the Superseding Indictment is denied.

SO ORDERED.

*/s/ Nina R. Morrison*
NINA R. MORRISON
United States District Judge

Dated:   July 15, 2025
         Brooklyn, New York

---

[8] In their respective briefs, the parties also cite the legislative history behind 18 U.S.C. § 875(c), each claiming that it supports their proposed reading of the statute. *See* Garnes Supp. Mot. at 4–9; Gov. Opp. at 17–20. Because the plain reading of the statute is not ambiguous as to whether an individual who receives a telephone call is "transmitting" the words they speak back to the original caller, the Court declines to pass on whether the legislative history of the § 875(c) supports either side's argument. *See Kammersell*, 196 F.3d at 1139 ("[T]here generally is no need for a court to inquire beyond the language of the statute. A threat that was unquestionably transmitted over interstate telephone lines falls within the literal scope of the statute and gives rise to federal jurisdiction." (internal quotation marks and citation omitted)).

20